(No. 56607, 56976 cons.—

HARRIS TRUST & SAVINGS BANK, Trustee, Appellee, v. WILLIAM L. DUGGAN *et al.*, Appellees (322 West Oakdale, Inc., *et al.*, Appellants).

*Opinion filed March 25, 1983.—Rehearing denied May 27, 1983.*

Donald Page Moore, Nancy L. Kaszak, and Richard J. Roddewig, all of Chicago, for appellants.

Raymond F. Simon and Joseph A. Spitalli, of Chicago (Simon & Spitalli, of counsel), for appellee Harris Trust & Savings Bank.

Stanley Garber, Corporation Counsel, of Chicago (Jerome A. Siegan and Philip L. Bronstein, Assistant Corporation Counsel, of counsel), for appellees City of Chicago, William L. Duggan, and Stanley Garber.

JUSTICE MORAN delivered the opinion of the court:

Plaintiff, Harris Trust & Savings Bank (Harris), filed three suits in the circuit court of Cook County against the city of Chicago and William Duggan, Commissioner of the Chicago Department of Inspectional Services. The actions involved the Kellogg mansion properties located in the 2900 block of North Lake Shore Drive. In the first suit, Harris, as trustee of the Helen L. Kellogg trust, sought a writ of *mandamus* compelling the city to issue demolition permits for the subject property. Harris subsequently challenged, in two separate suits, the validity of a zoning ordinance and landmark ordinance. The trial court ruled in plaintiff's favor in all three actions, and

awarded plaintiff a substantial money judgment. The city and Harris subsequently executed a settlement agreement whereby Harris promised to abandon its money judgment and the city agreed to issue the permits and forgo its right to appeal. Following execution of the settlement agreement, 322 West Oakdale, Inc. (Oakdale), Alderman Martin J. Oberman and Hedwig Braun sought leave to intervene, post-judgment, in the *mandamus* and landmark cases. The trial court denied intervention. Oakdale was allowed to intervene in the zoning case and appealed the judgment which was entered in plaintiff's favor. The appellate court consolidated the cases and affirmed the judgments of the trial court, holding that the zoning ordinance was unconstitutional and that Oakdale lacked standing to intervene in the *mandamus* and landmark cases. (105 Ill. App. 3d 839.) Oakdale, Oberman and Braun sought review here of this judgment. In a separate case, No. 56976, the same parties seek review of the denial of their petition challenging the validity of the settlement agreement. We granted leave to appeal and consolidated the cases for purposes of review.

The facts, largely adopted from the appellate court opinion, are not controverted. The subject property includes three contiguous parcels of real estate, each improved with a single-family residence. Upon the death of Helen Kellogg in 1978, the properties became assets of a charitable foundation, created to liquidate and distribute the Kellogg estate assets to various charities. In November of 1978, Harris executed a contract to sell the property for $2.6 million. The contract was subject to the purchaser's right to develop the property in accordance with R-8 (high rise) zoning. The property was zoned R-8 at the time the contract was executed, and had been so zoned for approximately 18 years.

In February of 1979, Harris applied to the city for demolition permits to raze the mansions. The permits

were granted on March 6, 1979, but were revoked the following day. In the letter of revocation, the city indicated that the property was located in an area under consideration for landmark designation. No landmark proceeding was pending at that time.

In April of 1979, Harris filed a two-count complaint seeking a writ of *mandamus* compelling reissuance of the demolition permits. While this action was pending, the city enacted an ordinance "down-zoning" the property from R-8 to R-5 (medium rise). In October 1979, Harris filed suit seeking a declaratory judgment that the amendatory zoning ordinance was unconstitutional and void. Oakdale sought, and was granted, leave to intervene in this action as a party defendant. In June of 1980, the trial court entered judgment in the zoning case, determining that the amendatory ordinance was unconstitutional. The court held that the property could be used in any manner consistent with R-8 zoning.

The following October, the court entered judgment for Harris in the *mandamus* case, ordering the city to reissue the demolition permits. The court also awarded Harris in excess of $1 million for the city's wrongful failure to issue the permits. However, the court stayed execution of its judgment pending a determination as to whether the property would be designated a landmark. The writ was later stayed again pending appeal.

On February 11, 1981, the city council enacted an ordinance designating the subject properties as Chicago landmarks. The following month, Harris notified the Commission on Chicago Historical and Architectural Landmarks (Commission) that it planned to demolish the buildings and the city should either allow the demolition or acquire the property through eminent domain. Harris also waived its right to any administrative hearing and requested the Commission to follow the applicable administrative procedures set forth in section 21—64.1 of

the Municipal Code of Chicago. The city rejected Harris' demands and denied an obligation to pay any compensation for the alleged "taking."

In May of 1981, Harris added count III to its *mandamus* complaint. This count alleged that the city's actions regarding the subject property deprived Harris of all reasonable use of the property for two years, and that the property was taken without due process or just compensation. The case proceeded to trial on the theory of inverse condemnation. Harris later amended its prayer for relief under count III, requesting a declaratory judgment that the ordinance designating the property as a landmark was unconstitutional and void.

On September 2, 1981, the court entered judgment for Harris on count III. It determined that the landmark ordinance, together with the city's refusal to issue the permits, deprived Harris of all reasonable use of the property and constituted a taking requiring payment of just compensation. The court found that $3.65 million would be just compensation, but did not enter the money judgment because the city was unwilling to acquire the property and compensate Harris therefor. Instead, the court entered a declaratory judgment declaring the landmark ordinance unconstitutional and void. The court also awarded Harris $1,037,849.76 under section 5 of "An Act to revise the law in relation to mandamus" (Ill. Rev. Stat. 1979, ch. 87, par. 5), for the city's wrongful failure to issue the permits. (As previously noted, this judgment had been rendered in October of 1980, but was stayed pending a determination as to whether the property would receive landmark designation.)

As related earlier, following judgment in this final action, the city and Harris executed a settlement agreement. The city agreed to issue the demolition permits and forgo its right to appeal, and Harris agreed to abandon the money judgment. In September of 1981, shortly

after learning of the agreement, Oakdale, Oberman, and Braun sought post-judgment intervention in the *mandamus* and landmark cases. The petition was denied, and they subsequently filed a separate lawsuit challenging the validity of the settlement agreement. Summary judgment was entered in Harris' favor, and the appellate court dismissed the appeal.

Further facts will be recited where relevant to a disposition of the issues.

### I. MANDAMUS AND LANDMARK CASES (Cause No. 56607)

Oakdale, a not-for-profit corporation with approximately 53 members, Martin Oberman, who was alderman of the ward in which the Kellogg mansions are located, and Hedwig Braun allege standing to intervene, post judgment, in the *mandamus* and landmark cases. We agree with the appellate court that the petitioners have not alleged a sufficient interest or injury so as to establish their standing to intervene. It should be kept in mind that intervention was sought after judgments were entered in the *mandamus* and landmark cases, and also after the settlement agreement had been completed.

Oakdale asserts that it is located 18 feet from the subject property and will be adversely affected by a razing of the mansions located thereon. The relevant portion of Oakdale's amended petition to intervene states:

> "14. Oakdale will also be substantially damaged in that issuance of a demolition permit and the consequent demolition of the Kellogg mansions will adversely affect the character of their neighborhood, remove an appealing and aesthetically attractive group of landmark structures, result in the construction of a new and much larger residential building which will increase traffic, congestion, and crowding in the neighborhood and substantially reduce property values in the area, including, most particularly, the value of the apartment house property owned by Oakdale and the approximately 53 individual apartment owners who are members of Oakdale, reside in the

Oakdale building, and are represented in this petition by Oakdale."

A fair reading of this paragraph indicates that Oakdale is alleging a reduction in property value, and other "injuries," as a result of the potential *construction* of a high-rise building. As noted by the appellate court, Harris was not seeking, in the *mandamus* and landmark cases, the right to construct a building. This relief was at issue in the zoning case, in which Oakdale was permitted to intervene. Oakdale fails to allege that demolition of the mansions will in itself decrease the value of its property.

We recognize that, as Oakdale points out, pleadings should be liberally construed. (*Pelham v. Griesheimer* (1982), 92 Ill. 2d 13; see Ill. Rev. Stat. 1979, ch. 110, par. 33(3)). However, it is well established that absent the necessary allegations of interest in the controversy, and injury as a result of the challenged action, the petitioner lacks standing to require a decision on the merits. *Cf. Underground Contractors Association v. City of Chicago* (1977), 66 Ill. 2d 371 (wherein an association lacked standing to seek a declaratory judgment because it failed to allege an injury or threat of injury); *Walker v. State Board of Elections* (1976), 65 Ill. 2d 543 (a party challenging the validity of a statute must be in immediate danger of sustaining a direct injury); see also *Warth v. Seldin* (1975), 422 U.S. 490, 45 L. Ed. 2d 343, 95 S. Ct. 2197.

It is further alleged by Oakdale, in apparent reference to the *mandamus* case, "that issuance of a demolition permit would cause an immense and irreparable loss to the petitioners by destroying the Kellogg mansions' unique contribution to the cultural heritage and history of the City of Chicago." Again, there is no assertion in the petition that Oakdale's property values will be decreased. Oakdale further alleges that an economic injury is not required to establish standing. Rather, the harm alleged may be environmental or aesthetic in nature. (*United States v. Students Challenging Regulatory Agency Procedures* (1973), 412

U.S. 669, 37 L. Ed. 2d 254, 93 S. Ct. 2405.) "Aesthetic considerations, although not disregarded, are not controlling ***." (*County of Lake v. First National Bank* (1980), 79 Ill. 2d 221, 228 (same principle concerning zoning ordinance).) Further, there must be an injury to an enforceable right or interest which, with respect to an intervenor, must be more than a "general interest" in the subject matter of the litigation. (*Maiter v. Chicago Board of Education* (1980), 82 Ill. 2d 373; *Cooper v. Hinrichs* (1957), 10 Ill. 2d 269; *Seger v. County of Du Page* (1978), 58 Ill. App. 3d 858.) It cannot be said that Oakdale, Oberman or Braun has more than a "general interest" in preservation of the Kellogg mansions. But *cf. Standard Bank & Trust Co. v. Village of Oak Lawn* (1978), 61 Ill. App. 3d 174 (wherein neighborhood property owners were permitted to intervene because they alleged a reduction in their property values as a direct result of a judgment allowing erection of a shopping center near their properties).

Oberman also seeks intervention on the ground that he was deprived of certain rights and duties arising out of his status as alderman in the ward in which the Kellogg property is located. We note initially that aldermanic status alone is insufficient to confer a right to intervention. (*University Square, Ltd. v. City of Chicago* (1979), 73 Ill. App. 3d 872.) However, Oberman contends that, as a member of both the finance committee and the city council, he was deprived of his right under sections 21—62 through 21—64 of the Chicago Municipal Code (Code) to review Harris' applications for demolition permits, and determine whether compensation should be paid. Under the Code, the building department must forward to the Commission applications for demolition of buildings which have been designated landmarks. The application and any recommendations applicable thereto are then forwarded to the finance committee, and ultimately to the city council, which renders the final decision. Oberman asserts that Harris improperly

bypassed this administrative process and sought judicial relief.

Oberman cannot seek to intervene as representative of the finance committee or city council. He is only a member thereof, and was not granted authority to act on behalf of those administrative bodies. (See *In re Appointment of Special State's Attorneys v. Grabavoy* (1976), 42 Ill. App. 3d 176.) Since the committee and council members cannot act individually, Oberman had no power to act individually. (*Cf. Pauly v. County of Madison* (1919), 288 Ill. 255 (members of the board of supervisors have no authority to act individually); *In re Appointment of Special State's Attorneys v. Grabavoy* (1976), 42 Ill. App. 3d 176 (same)). We therefore hold that, in his individual capacity, Oberman lacked a sufficient interest to intervene, post judgment, in the *mandamus* and landmark cases.

He also alleges that he was deprived of the right, under chapter 6—8 of the Code, to determine the validity of settlement agreements negotiated by the attorney for the city. For the reasons stated above, we do not believe this assertion establishes a right to intervene. It is the duty of the city council, as a whole, to consider settlement agreements. In fact, subsequent to the settlement agreement, the city council passed a resolution indicating that it agreed to allow demolition of the mansions, and development in accordance with R-8 zoning.

Petitioners also briefly allege that they have standing to sue because of their status as taxpayers. Our review of their briefs filed in the appellate court indicates that the issue of taxpayer standing was not raised in that court. It is well established that issues which could have been raised in the appellate court but were not are deemed waived. (*E.g., Clore v. Fredman* (1974), 59 Ill. 2d 20; *City of Lawrenceville v. Maxwell* (1955), 6 Ill. 2d 42; *cf. Demchuk v. Duplancich* (1982), 92 Ill. 2d 1 (legal theories of recovery not previously raised will not be considered by this court).)

Consequently, the issue of taxpayer standing in the instant case was not properly preserved for review, and we decline to address it.

We find no merit to the further contention that disposing of certain issues on the grounds of standing, rather than addressing the merits of the claims, violates the fourteenth amendment. The very purpose of the standing doctrine is to assure that issues are raised only by those individuals with a sufficient stake in the outcome of the controversy. (*Sierra Club v. Morton* (1972), 405 U.S. 727, 31 L. Ed. 2d 636, 92 S. Ct. 1361.) It is well established that, where standing is lacking, it is inappropriate to consider the merits of the claims raised. See, *e.g., Warth v. Seldin* (1975), 422 U.S. 490, 45 L. Ed. 2d 343, 95 S. Ct. 2197.

For the above-related reasons, we hold that the trial judge did not abuse his discretion is denying the post-judgment petition for intervention in the *mandamus* and landmark cases. It is therefore unnecessary to reach Harris' additional argument that the petition was not timely filed.

ZONING CASE

Oakdale was permitted to intervene in the zoning case, and we therefore address the issue of whether the downzoning from R-8 to R-5 was unconstitutional and void as applied to the property. Pursuant to a comprehensive study conducted in 1961 on behalf of Chicago, it was determined that the properties fronting Lake Shore Drive, between Belmont and Diversey, including the subject property, should be zoned R-8. The properties were so classified, in accordance with a city policy of allowing the highest density zoning adjacent to the lakefront. A number of high rises in the area were constructed to the allowable limit under R-8 zoning. A hospital and convent, also located within the area, were developed in conformity with R-5 zoning. (The convent property was "down-zoned" from R-8

to R-5 after the subject property was "down-zoned.") The properties between Lake Shore Drive and Sheridan Road (which runs immediately west of the subject properties) were zoned between R-5 and R-7. The properties on either side of Sheridan Road are in conformance with R-7 zoning.

The Kellogg properties retained their R-8 classification from 1961 until 1979. At that time, as previously noted, an amendatory zoning ordinance was enacted, down-zoning the parcels to R-5. No other property was affected by the ordinance. As a result of the down-zoning, performance under the contract previously referred to did not take place.

A number of witnesses testified concerning the propriety of the amendatory zoning ordinance. Rolf Campbell, a witness for Harris, stated that he was a city planning and zoning consultant. He indicated that the predominant use and trend of development in the subject area is multiple-family, high-rise buildings in conformance with R-8 zoning. In his opinion, an R-5 zoning classification would therefore not be consistent with the predominant use in the area. He further testified that the highest and best use of the subject parcels would be construction of a high-rise. He stated that development of the subject property in accordance with R-8 zoning would have no adverse effect on the community or adjacent properties. He further indicated that the fact that other properties in the area were down-zoned to R-5, after the subject property, did not change his opinion that an R-5 classification would be inconsistent with development in the area. In his opinion, rezoning of the property was not undertaken pursuant to a comprehensive zoning amendment.

On cross-examination, Campbell stated that it may be proper to have more than one residential classification within a given block. On redirect examination, he testified that there should be only one zoning classification in the area in which the subject properties are located.

Terrence O'Brien, a real estate appraiser, broker and

consultant, also testified on behalf of Harris. He defined the phrase "highest and best use" as the "use which would yield the greatest net return to a property and its owner." In his opinion, the highest and best use of the subject properties would be to develop them in accordance with an R-8 classification. In his view, such a development would not have an adverse impact on the value of surrounding properties. The witness agreed with Campbell's conclusion that the predominant use of the properties between Belmont and Diversey, on Lake Shore Drive, is multifamily construction "similar to an R-8 classification." He further testified that the fair market value of the property under R-8 zoning is $3.2 million. He valued the property at $1.78 million under an R-5 classification, a difference of $1.42 million.

Dale Park, Jr., an attorney specializing in estate planning and administration, stated that he was the director of the Helen L. Kellogg foundation. He testified that, in anticipation of the proceeds to be realized from the contract executed in 1978, the foundation pledged funds to the University of Notre Dame and Northwestern University. In reliance on the pledge, Northwestern renamed its management school the "John L. Kellogg Graduate School of Management." Notre Dame created a new learning center and hired faculty to staff it. As a result of the down-zoning and consequent inability to perform under the contract, the foundation is unable to meet these binding pledges.

Harris called Martin Murphy, commissioner of the Department of Planning, as an adverse witness. He testified that, after a study of the subject area, he recommended to the city council that the property not be down-zoned to R-5. In his testimony before the building and zoning commission of Chicago in June of 1979, he had stated that a rezoning from R-8 to R-5 was out of character with the established zoning. He later withdrew his objection because he understood that a comprehensive rezoning of the area

was being considered. However, he still did not recommend passage of the ordinance.

Wallace Nelson, a vice-president of the First National Bank, testified that the Kellogg account was assigned to him for supervision in 1971. At that time, Helen Kellogg owned two parcels of the subject property and wished to acquire a third. Pursuant to an appraisal of the parcel, the bank quoted $500,000, the purchase price, as the fair market value of the property. A reason cited for the valuation was the "desirable" R-8 zoning classification.

Further testimony presented by Harris indicated that no attempt was made to sell the property under the R-5 zoning. Lance Morgan, the vice-president of the trust department at Harris, stated no effort was made to sell the property as R-5 because it should be zoned R-8, and was worth more under the latter classification.

Two witnesses testified on behalf of the city. Jerome Jacobson, the deputy commissioner of the Department of Planning, stated that two zoning classifications can exist within one block and be compatible. He also stated that zoning changes were being undertaken throughout the area in order to reduce density. The changes were made pursuant to a general plan. Jacobson estimated that 85% to 90% of the land in the area had been down-zoned, excluding those properties already developed to the maximum density permitted under the ordinance. In his opinion, the subject property should be zoned R-5 in light of the development in the surrounding area and the desire to control congestion.

On cross-examination, Jacobson admitted that the predominant use of the property in the area was in accordance with R-7 and R-8 zoning. He stated that properties in the immediate area currently zoned R-5 were so classified after the subject property. On re-cross-examination, he defined the "highest and best use" of property as that which "best serves the needs of the community and the City it-

self."

John McNamara, a real estate broker, appraiser and consultant, stated that the property, as zoned R-5, is worth $1.8 million. Under R-8 zoning, it is worth $3.05 million. He therefore agreed that the subject property is more valuable under an R-8 classification, but stated that the highest and best use of the property is in accordance with R-5 zoning.

On cross-examination, McNamara defined the "highest and best use" of property as "the use to which the property can be put over a period of time, with the greatest amount of monetary return to the owners." He nevertheless insisted that R-5 zoning represents the highest and best use, contrary to his definition thereof.

Oakdale contends that a zoning ordinance is valid as long as there is any rational basis upon which it can be sustained. Here, the ordinance was allegedly enacted to reduce density in the lakefront area. Oakdale further argues that if the validity of the ordinance is fairly debatable, the city council's judgment must control. It is asserted that the ordinance does not constitute impermissible "spot" zoning because there has been a systematic down-zoning of properties in the subject area since 1975.

Harris alleges that the ordinance is arbitrary and capricious because it relates only to the subject property (rendering it in nonconformance with existing uses in the area), and it fails to serve any public purpose. It is further argued that the reclassification violated Harris' vested rights acquired under the original classification. Harris points out that a purchase, a sale and certain charitable donations were undertaken in reliance on the R-8 zoning.

As noted by the appellate court, a zoning ordinance is presumed valid, and the burden is upon the party attacking the ordinance to establish its invalidity by clear and convincing evidence. (*Duggan v. County of Cook* (1975), 60 Ill. 2d 107, 111.) Factors "which may be taken into consider-

ation in determining validity of an ordinance are the following: (1) The existing uses and zoning of nearby property [citations], (2) the extent to which property values are diminished by the particular zoning restrictions [citations], (3) the extent to which the destruction of property values of plaintiff promotes the health, safety, morals or general welfare of the public [citations], (4) the relative gain to the public as compared to the hardship imposed upon the individual property owner [citations], [and] (5) the suitability of the subject property for the zoned purposes ***." *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 46-47.

We find that these factors weigh substantially in favor of Harris. As previously noted, most of the property within the immediate subject area, fronting Lake Shore Drive, was zoned R-8 and had been so classified since 1961. The ordinance in question affects only the Kellogg property. Although there was conflicting evidence as to whether the rezoning was pursuant to a comprehensive plan, this fact does not, as Oakdale suggests, "require a finding that the reasonableness of the ordinance is debatable." (12 Ill. 2d 40, 47.) In addition, the trial court found that the harm to Harris outweighed any benefit to the public. The down-zoning precluded the negotiated land sale, substantially reduced the value of the property, and impedes Harris' fiduciary responsibilities as to its charitable obligations. In terms of the suitability of the property for R-5 zoning, many of the witnesses testified that the highest and best use of the property was development in accordance with R-8 zoning. There was testimony to the effect that construction consistent with an R-8 classification would have no adverse effect upon the community, or the value of the surrounding properties.

It has frequently been said that zoning ordinances must bear a *substantial* relationship to the public health, safety and welfare. (*E.g., La Grange State Bank v. County of*

*Cook* (1979), 75 Ill. 2d 301, quoting *Tomasek v. City of Des Plaines* (1976), 64 Ill. 2d 172, 179-80.) This is because "a property owner has the right to expect that the classification imposed by the original zoning ordinance will not be changed unless such is required for the public good." (*Garner v. City of Carmi* (1963), 28 Ill. 2d 560, 564; *Zilien v. City of Chicago* (1953), 415 Ill. 488, 493.) The trial court found an undue invasion of Harris' constitutional rights without a sufficient concomitant benefit to the public. From our review of the record, we are unable to say that this determination was against the manifest weight of the evidence. See *La Grange State Bank v. County of Cook* (1979), 75 Ill. 2d 301, 309; *Pioneer Trust & Savings Bank v. County of Cook* (1978), 71 Ill. 2d 510, 516-17.

In so holding, we find inapposite *Agins v. City of Tiburon* (1980), 447 U.S. 255, 65 L. Ed. 2d 106, 100 S. Ct. 2138, and *Amdur v. City of Chicago* (7th Cir. 1980), 638 F.2d 37, *cert. denied* (1981), 452 U.S. 905, 69 L. Ed. 2d 406, 101 S. Ct. 3031, cited by Oakdale. *Agins* involved the question of whether the *mere* enactment of a zoning ordinance limiting property development constitutes a taking. In determining that it did not, the court noted that, contrary to the instant case, the ordinance did not prevent the best use of owners' land and, apparently, affected other property.

The court in *Amdur* relied on the *Agins* opinion in resolving the same issue. It, too, noted that the ordinance did not prevent the best use of the owner's land. Further, unlike the instant case, there was no evidence indicating that the owner took any action in reliance on a preexisting zoning classification.

## II. SETTLEMENT AGREEMENT (Cause No. 56976)

Consolidated with this case is Oakdale's separate appeal in cause No. 56976. This appeal again challenges the validity of the settlement agreement entered into between the

city and Harris. Oakdale claimed in the trial court that the agreement was void because it was executed without city council approval. The city council later adopted a resolution allowing for demolition of the buildings and development in accordance with R-8 zoning, after which the trial court granted Harris summary judgment. Based upon this action, Harris moved for a dismissal of the appeal, which the appellate court granted.

Oakdale cites no authority in support of the proposition that the appellate court erred in dismissing its appeal. Our attention is directed only to portions of the complaint which, it is asserted, "establishes a cause of action." The recited provisions basically allege that Harris failed to exhaust its administrative remedies, in the landmark case, prior to instituting a suit in the court for redress.

Because we have found that Oakdale and Oberman lacked standing to intervene in the landmark case, it is difficult to see how they would have standing to attack a settlement agreement relating thereto. In addition, virtually the identical issue was raised by Oberman in cause No. 56607. Indeed, in its petition herein for leave to appeal, Oakdale stated that "[t]he subject matter, the identity of the petitioners, and the key respondents are all identical to those in the pending Kellogg cases." It appears that the complaint in this case is an attempt to relitigate an issue decided adversely to Oakdale in the prior proceeding. We therefore conclude that the appellate court did not err in dismissing the appeal.

Accordingly, for the reasons stated herein, the judgments of the appellate court in cause No. 56607 and cause No. 56976 are affirmed.

*Judgments affirmed.*