RICHARD HAHNENKAMP *et al.*, Plaintiffs-Appellants, v. MADISON COUNTY *et al.*, Defendants-Appellees.

Fifth District   No. 5—87—0606

Opinion filed May 2, 1989.

Farrell & Long, P.C., of Godfrey (J. Thomas Long, of counsel), for appellants.

Dick Allen, State's Attorney, of Edwardsville (Lewis E. Mallott, Assistant State's Attorney, of counsel), for appellees.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Plaintiffs, Richard and Janet Hahnenkamp, appeal from a declaratory judgment of the circuit court of Madison County granting plaintiffs' request for a special use permit against defendants, Madison County, a body politic, Nelson Hagnauer, in his capacity as chairman, Madison County board (county board), and Roy Fruit in his capacity as chairman, Madison County zoning board of appeals (zoning board), but imposing restrictions on plaintiffs' use of the property under the special use permit. Plaintiffs also appeal from the order of the circuit court which found the zoning ordinance in question constitutional. We affirm as to the constitutionality of the zoning ordinance. We reverse as to the imposition of restrictions on the special use permit.

Plaintiff, Richard Hahnenkamp, is a businessman. He and his wife, Janet, reside in Madison County and own property located at 3034 Godfrey Road, Godfrey, in Madison County, which is the subject of this suit. Said property is zoned B-2, general business use, under the Madison County zoning ordinance (ordinance). Any permitted use in a B-1 zone, limited business use, is also permitted in a B-2 zone pursuant to section 210.3 of the ordinance. A restaurant is a permitted use under a B-1 zone, and is, therefore, permitted in a B-2 zone. Under section 210.4 of the ordinance, bars/nightclubs are permitted uses and require a special use permit for operation.

Plaintiffs intended to open a gourmet Italian restaurant on the property and spoke to Manuel Romaro about managing the restaurant. Mr. Romaro already operates an Italian restaurant in Alton, and the plan between plaintiffs and Mr. Romaro was to open the same type of restaurant. Plaintiffs desired to serve alcohol at their restaurant, intending to serve drinks to diners who were seated. Additionally, plaintiffs planned a waiting area with a bar, five bar stools, and a bartender. Plaintiffs requested the issuance of a liquor license from the liquor commissioner of Madison County, Nelson Hagnauer. Plaintiffs were given an application and told to go to the Madison County zoning office to ascertain the zoning of the property. At the zoning office, plaintiffs were told by the zoning administrator, Paul Hawkins, that a special use permit would be required under section 210.4 of the ordinance before a liquor license could be issued.

Plaintiffs applied for a special use permit. In conjunction with plaintiffs' application, a hearing was conducted on the site of plaintiffs' property on November 5, 1986, by the zoning board. The zoning board then presented their findings to the county board. On November 19, 1986, the county board voted to deny plaintiffs' application for a special use permit under section 210.4 of the ordinance. On Decem-

ber 17, 1986, plaintiffs filed a complaint for declaratory judgment seeking to overturn the action of the county board and to obtain an injunction to rezone plaintiffs' property. At trial, the following facts were adduced.

Plaintiffs' first witness was Nelson Hagnauer, chairman of the Madison County board for 16 years. Mr. Hagnauer is also the liquor commissioner. He was called as an adverse witness pursuant to section 2—1102 of the Illinois Code of Civil Procedure (Code) (Ill. Rev. Stat. 1985, ch. 110, par. 2—1102). As the liquor commissioner, he is the ultimate authority on the issuance or nonissuance of liquor licenses. Mr. Hagnauer testified that there is a liquor code in force in Madison County, but no empirical studies have been done to determine the number of licenses to be issued, and at this time, there is no limitation on the number of liquor licenses which will be issued. Further, Madison County has no comprehensive zoning plan.

According to Mr. Hagnauer, the cost for a liquor license to sell package liquor and the cost for a license to sell liquor by the drink are the same. Mr. Hagnauer granted plaintiffs a license to sell package liquor, which does not allow plaintiffs to sell liquor by the drink because plaintiffs' land was not zoned correctly. There is no written authority to differentiate between package liquor licenses and by-the-drink liquor licenses, but it has been the practice of the liquor commission to grant these licenses separately. Mr. Hagnauer also testified that the requirements to obtain a liquor license are twofold: first, applicant can have no prior felony convictions, and, second, applicant must be, or the manager must be, a resident of Madison County. If these two requirements are met, the applicant is automatically granted a liquor license.

Plaintiff Richard Hahnenkamp was the next to testify. He testified that the land in question already had a building in place that was approximately 4,300 square feet. Plaintiff planned to use 3,000 square feet for his Italian restaurant. A travel agency was renting the rest of the building, and plaintiff expected the travel agency would renew its lease. The building has a 10,000-square-foot parking lot in front, with paved parking on the side and potential parking in the back. Plaintiff estimated he would need to add $40,000 to $50,000 worth of improvements to the building in order to convert it into the type of business he desired. Further, plaintiff testified that he planned to work out an arrangement with Manuel Romaro to be the chief chef and to manage the restaurant. Plaintiff and Mr. Romaro would share in the profits. The expected times of operation of the restaurant are 11 a.m. to 2 p.m. for lunch and 5 p.m. to midnight for dinner. Plaintiff testified

that he desires to serve alcohol on the premises in order to make the business more profitable. Plaintiff said he wanted to have a bar which would seat five people and also make alcohol available by the glass to diners. Plaintiff said when he applied for a liquor license and received it, he did not know that he had a package liquor license. It was not until six months later that he realized he had a package liquor license, but he had no intention of serving package liquor.

Plaintiff also testified as to the businesses operating in the surrounding area of his proposed restaurant. There is a Pizza Hut on the south side of plaintiff's building. The Pizza Hut has a liquor license and serves beer and wine. There is a bowling alley on the north side of plaintiff's building that has a full-service liquor license. Patrons of the bowling alley can get food and alcoholic beverages by the drink. Across from plaintiff's property is the Highway House Hotel and Restaurant. The Highway House Restaurant has a full-service liquor license. There is a bar, Wicks, approximately 200 feet down the road from plaintiff's property. Wicks is a small bar with a full liquor license. On cross-examination, plaintiff testified he intended to hire a bartender. Patrons would be able to drink at the bar without ordering food.

Mr. Roy Fruit, chairman of the zoning board, was called next as an adverse witness pursuant to the Code (Ill. Rev. Stat. 1985, ch. 110, par. 2—1102). Mr. Fruit has been a member of the board for approximately 17 years and chairman for 10 years. The board conducts hearings and makes decisions on zoning matters. Members are appointed by the county board to make determinations on zoning hearings. Mr. Fruit testified that the zoning board relies on the county zoning code to make its decisions along with the members' best judgment. Board members have no special training in the area of zoning matters.

Mr. Fruit chaired the hearing on plaintiffs' application for a special use permit. According to Mr. Fruit, plaintiffs' request was denied by the zoning board because the zoning board felt the liquor licenses had reached a "saturation point" in Godfrey in the particular area where plaintiffs wanted to operate their business. No studies were conducted prior to the hearing to determine that there were too many liquor licenses in the area. Mr. Fruit could not say how far the "saturation point" extended into that particular area. Mr. Fruit testified that if there were a hearing held on a different piece of property 100 yards up the road, it could be determined that the saturation point did not extend that far and a special use permit could be granted. In addition to the saturation point, Mr. Fruit testified that the zoning board denied plaintiffs' application for a special use permit because

the zoning board believed that any additional business in the area would add to traffic congestion. The witness agreed that a restaurant with a liquor license would not necessarily increase traffic more than other uses allowed under the B-2 classification. According to Mr. Fruit, the position of the zoning board is that there are enough liquor and food licenses in the area.

Mr. Fruit participates in approximately 500 hearings per year. A hearing can last between five minutes and one hour. After a hearing, the zoning board members go to the back office to discuss the evidence and make a decision the same day. Then the zoning board's secretary, who is not a member, drafts the findings based on the discussions. No transcript or recordings are made of the zoning board's discussions. After the zoning board's initial determination, there is never another vote. No vote is taken on the written findings. The report of findings on plaintiffs' application drafted and typed by the zoning board's secretary does not mention a "saturation point." The written findings state that plaintiff's application "would be in conflict with the aims and goals of the ordinance in that we are trying to orderly develop land and add to the growth pattern in the area." Mr. Fruit acknowledged that the aims and goals of the zoning board are not written or published in any form. In order to determine the aims and goals, one must ask the zoning board.

David Brammeier, an engineer with a firm specializing in traffic and transportation engineering, was the next witness to testify. In addition to being an engineer, Mr. Brammeier is a city council member in Glen Carbon and deals with zoning ordinances and problems in that capacity. Mr. Brammeier inspected the property in question, reviewed the zoning ordinance, and completed a study on plaintiffs' property. As part of the study, he concluded that the greatest traffic flow and worst traffic conditions in the area in question occur on Friday. Without plaintiffs' business, there are 23 cars that pass plaintiffs' property during the peak evening hour on Friday. With the addition of plaintiffs' business, Mr. Brammeier gave an estimate that 18 to 30 cars would pass plaintiffs' property during the peak evening hours of Friday. On Saturday, the peak evening hour would have an increase from 20 vehicles to 30 vehicles. This is an insignificant increase in Mr. Brammeier's opinion. It is an addition of less than one car every two minutes. Mr. Brammeier testified that there would be no difference in these rates whether or not alcohol was available at plaintiffs' establishment. Additionally, Mr. Brammeier testified that the 10,000 feet of parking space at plaintiffs' building was adequate for plaintiffs' proposed use of the building and there is no evidence of a greater risk of

accidents in front or around a restaurant which serves liquor. Mr. Brammeier also concluded that several other B-1 and B-2 uses would create more traffic than plaintiffs' proposed eating and drinking establishment.

Paul Hawkins, the building, zoning, and environmental official for Madison County, was the next witness. Mr. Hawkins stated that it is the position of his office that plaintiffs needed a special use permit because the county takes the position that, under the B classifications 1 through 4, in order to get a liquor license, the licensee must have a special use permit. While this is not written anywhere specifically, Mr. Hawkins stated that the language he was ultimately depending on was section 210.4, which requires bars and restaurants to obtain a special use permit. It is the county's position, according to Mr. Hawkins, that a bar or nightclub includes a restaurant serving liquor by the glass. Mr. Hawkins agreed that Pizza Hut and Wicks are both operating through special use permits. The bowling alley and the Highway House Restaurant were both in operation prior to the 1974 zoning ordinance, and therefore they are nonconforming uses. The zoning ordinance was changed in 1974 because Madison County was having problems with certain establishments allowing gambling and prostitution. The county liquor commission revised the ordinance in order to make special use permits necessary for bars and nightclubs in an attempt to stop gambling and prostitution. Taverns also require special use permits. Mr. Hawkins could not remember if plaintiffs told the zoning board whether the restaurant would have a bar with a bartender, but he knew that there was some type of bar proposed. On cross-examination, Mr. Hawkins agreed that there is a difference between nightclubs and restaurants that serve liquor. Mr. Hawkins agreed that these two are now lumped together by the ordinance, but he would like to see them given separate consideration. Mr. Hawkins does not believe there is a gambling or prostitution problem in the area of plaintiffs' proposed restaurant. Mr. Hawkins further testified that he had not heard about a "saturation point" in liquor licenses in the area of plaintiffs' proposed restaurant. Finally, Mr. Hawkins testified that if plaintiffs are granted a special use permit and over the years the character of the establishment should change from a restaurant with incidental sales of alcohol to a bar primarily serving alcohol, the county could revoke plaintiffs' liquor license after a hearing. The court then questioned Mr. Hawkins about businesses that change their characteristics over the years and about the limitations which may be placed on a special use permit to prohibit such changes. The witness agreed that stipulations, such as requiring a certain percentage of

gross sales of food, can be made in the special use permit.

Mr. Edwin Roller, a real estate appraiser in the Alton-Godfrey area, testified that he inspected plaintiffs' property. Sixty to seventy percent of the buildings in this area are zoned commercial. He also testified that while zoning classifications do have an effect on property values, he sees no adverse effects on the surrounding property values should plaintiffs be given a special use permit. On cross-examination, the witness agreed that certain types of bars or restaurants could cause property values, especially residential properties, to diminish. However, he does not see any diminution in value of surrounding properties by the addition of plaintiffs' proposed establishment.

Carl Lossau was the next witness to testify. He testified as an expert. Mr. Lossau has a Ph.D. with his specialization in urban geography. Additionally, he was an alderman in Edwardsville for eight years, a member and chairman of the Edwardsville city planning commission, and project director of the development of the regional land use plan for the East-West Gateway Coordinating Council. He also taught graduate courses in city and regional planning at Southern Illinois University at Edwardsville. Mr. Lossau testified that he is familiar with zoning ordinances. The purpose of a definition section of a zoning ordinance, according to Mr. Lossau, is to reduce to the greatest extent possible any kind of ambiguity that might arise out of language which is used in the rest of the text. In the Madison County Zoning Ordinance, Mr. Lossau believes that a significant ambiguity arises because the words "restaurant" and "bar" are not defined, while "tavern or lounge" is defined.

In the instant case, a restaurant is a permitted use in a B-2 area. If a use is permitted, then whatever other permits are necessary should be automatically administered, i.e., a building permit. Mr. Lossau testified that he could find no references in the zoning ordinance that a restaurant that desired to serve liquor required a special use permit. After looking at the area in question, Mr. Lossau believed that there was no real conflict between the planned restaurant serving liquor and the existing uses of property located near plaintiffs' land. Further, according to Mr. Lossau, the proposed use of plaintiffs' property does not have any deteriorating effect on the health, welfare, safety, or morals of the people of that area. Mr. Lossau bases this opinion on the premise that there has been no deterioration as a result of Wicks bar or the bowling alley. Further, the proposed restaurant serving alcohol is not much different than the uses already existing in that area. Madison County does not have a comprehensive plan and Mr. Lossau believes that causes problems because the county has

to control land use through zoning without determining in advance how much land is going to be used for each particular type of use. There is a land use plan for Madison County which has never been adopted. Mr. Lossau testified that preparing a plan without adopting it poses problems because without adoption there is no commitment to the plan. Consequently, decisions can be made with guidance by the plan when it is convenient to use the comprehensive or land use plan, but when it's inconvenient, the plan can be ignored. This leads to inconsistency in development. Mr. Lossau believes that the better way to limit the use of property to serve liquor is through the issuance or nonissuance of liquor licenses, not through zoning laws.

The court then asked this expert to give a ratio of food to liquor sales that would serve as a definition for a restaurant serving liquor. Mr. Lossau testified that the range would be somewhere between 80% to 90% for food sales. One way municipalities could enforce this imposed ratio would be to require that the owner ring up sales for the bar separate from sales for food. In order for a licensee to maintain his special use permit, the dollar sales of food could be equal to 80% to 90% of total revenue. Mr. Lossau then testified on redirect that looking at revenue is only one way to impose restrictions. Another way which many restaurants figure this ratio is in terms of total space. With this method, 80% to 90% of the floor space of the building would be devoted to food service with 10% to 20% devoted to alcohol sales.

At the close of the evidence, the trial court found the Madison County zoning ordinance constitutional. Plaintiffs were granted a special use permit for their proposed eating and drinking establishment because the trial court found that the denial of the permit was arbitrary and unreasonable and bore no substantial relation to the public health, safety, welfare or morals. The court imposed a restriction on the special use permit that at least 80% of the restaurant business must be food service.

Plaintiffs' first issue on appeal attacks the constitutionality of the county zoning ordinance as applied to plaintiffs' property. The basis of the attack is that the language of the ordinance is unconstitutionally vague. According to plaintiffs, it is impossible to determine by a thorough reading of the Madison County zoning ordinance, sections 210.1 through 210.4, that restaurants desiring to serve liquor must also obtain a special use permit. Section 210.3 is the pertinent portion of the zoning ordinance setting forth the permitted uses in a B-2 area. It clearly states that any use permitted in a B-1 zone is also permitted in a B-2 zone. Section 210.4 sets forth the special uses in a B-2 zone.

This section clearly states that "bars/nightclubs" require a special use permit. Additionally, section 209.3 states that a restaurant is a permitted use in a B-1 zoned area. The statute does not define the terms restaurants, bars, or nightclubs. A tavern or lounge, however, is defined as a building where liquors are sold to be consumed on the premises, but not including restaurants where the principal business is serving food. In summary, plaintiffs argue that a special permit is not required because (a) the zoning ordinance does not within its term require a restaurant seeking to serve liquor to apply for a special use permit; (b) the term "bars/nightclubs" found in the zoning ordinance is undefined and as such is ambiguous and cannot be expanded through an unwritten policy to include plaintiffs' restaurant.

■■ The special use technique is a valid means of land use control. (*Kotrich v. County of Du Page* (1960), 19 Ill. 2d 181, 166 N.E.2d 601.) Further, the rule that an ordinance is void if it is indefinite and uncertain and its precise meaning cannot be ascertained applies to zoning ordinances. (*County of Lake v. First National Bank* (1980), 79 Ill. 2d 221, 402 N.E.2d 591.) The test for determining whether a zoning ordinance is unconstitutionally vague is whether men of ordinary intelligence must guess at its meaning. *Lakin v. City of Peoria* (1984), 129 Ill. App. 3d 651, 472 N.E.2d 1233.

■■ ■ The facts indicate that plaintiffs' proposed establishment was not merely a restaurant. If plaintiffs' establishment were only a restaurant it would be a permitted use under section 209.3 and no hearing would have been necessary. However, plaintiffs' testimony revealed that, in addition to the planned Italian restaurant, there was to be a bar area, complete with a bar, five stools, and a bartender. While the words "restaurant," "bar," and "nightclub" were not defined by the ordinance, we believe that these words are distinguishable and that plaintiffs or any other person of common intelligence or understanding could read the Madison County ordinance and realize that a special use permit would be necessary for the type of establishment plaintiffs envisioned. There is no need or requirement to list definitions for words that have a common meaning and can be understood by the average person. To require counties to define such words would result in lengthy and cumbersome ordinances.

Plaintiffs analogize this case to *County of Lake v. First National Bank* (1980), 79 Ill. 2d 221, 402 N.E.2d 591. We find that the cases are distinguishable. In *County of Lake*, the defendant's property was zoned agricultural and the zoning ordinance required a "conditional use permit" for the operation of an "airport" or "heliport" in an agricultural zone. Neither term was defined in the ordinance. The plaintiff

was, and had been, using his land for a restricted landing area and a museum when the county brought suit to enjoin such use of the land. The supreme court found that the definitions of an airport and a restricted landing area contained in the Illinois Aeronautics Act (Ill. Rev. Stat. 1975, ch. 15½, pars. 22.6, 22.8), as well as municipal and county airport acts, were mutually exclusive. It was held that the zoning ordinance was ambiguous and thus did not apply to the restricted landing area. Unlike *County of Lake*, which dealt with highly specialized terms, the instant case deals with words that are common and have an accepted meaning.

Likewise, we are able to distinguish *Union National Bank & Trust Co. v. Village of New Lenox* (1987), 152 Ill. App. 3d 919, 505 N.E.2d 1, in which a land trustee brought an action for declaratory injunctive relief against the village asking the court to declare invalid a zoning ordinance which required a special use permit to use land for an asphalt plant. An asphalt plant was not specifically listed under permitted uses, prohibited uses, or special uses. The court found that whether an asphalt plant might fit into one of the categories was uncertain because the list of prohibited and permitted uses was not comprehensive as evidenced by the language "but not limited to" in both the permitted and prohibited use categories. The problem was compounded because under the special use category it allowed uses which were similar and compatible to an incomplete list of permitted uses. The court found such language unconstitutionally delegated legislative power to the village board because it did not prescribe any standards or guidelines to determine what uses were "similar and compatible." In the instant case, there is no open-ended language such as "but not limited to" which caused the vagueness problems in *Village of New Lenox*. The ordinance in question contains, in our estimation, exhaustive lists of both permitted and special uses.

■ Plaintiffs further argue that the ordinance as applied to them is vague, arbitrary, and unreasonable, and has no substantial relation to the public health, safety or welfare. The trial court found that there was clear and convincing evidence that defendants' denial of the zoning permit for plaintiffs to establish a restaurant was arbitrary and unreasonable and bore no substantial relationship to the health, welfare, safety and morals of the county's residents, and ultimately gave plaintiffs the special use permit they requested. We agree with the trial court and find no reason why plaintiffs should not be granted a special use permit.

This brings us to plaintiffs' second and third issues, which can be discussed together inasmuch as both allege the trial court erred by

imposing restrictions upon the special use permit issued to plaintiffs. The trial court imposed the following restrictions:

"The premises shall be used primarily for the sale of food. The sale of liquor shall be only incidental as described by Plaintiffs' testimony. The criteria to determine that the premises be used as a restaurant, rather than as a tavern or lounge, is that at least 80 percent of the business of the establishment shall be food service. This percentage figure is based upon testimony from Plaintiffs' expert, Doctor Carl Lossau."

Plaintiffs agree that the county board may attach conditions to a special use permit pursuant to section 805.0 of the ordinance. Section 805.0 allows the board to impose restrictions on the granting of the special use permits, including

"(b) Limitations on periods of use and operation.

(c) Imposition of operational controls, sureties, and deed restrictions."

Plaintiffs contend that only the loosest of interpretations would warrant the conclusion that limitations on "operation" means that the county board can step in and restrict the percentages of sales in the restaurant. Further, plaintiffs argue that even if such language is found to grant to the county board the ability to impose such restrictions, said restrictions imposed by the trial court do not bear a real and substantial relation to the public health, safety, morals or general welfare of the public and, further, are against the manifest weight of the evidence.

We find that the language of section 805.0 of the ordinance empowered the county board to impose restrictions on a special use permit. Additionally, *Sinclair Pipe Line Co. v. Village of Richton Park* (1960), 19 Ill. 2d 370, 167 N.E.2d 406, has provided the trial courts with the ability to frame a declaratory judgment ruling based upon the proposed use of the property as represented at trial.

■■ ■ The general rule that the person attacking the ordinance, or in this case the restrictions, must prove by clear and convincing evidence that the zoning ordinance and its restrictions, as to him, are arbitrary and unreasonable and without substantial relation to public health, safety, morals, or welfare applies. (*Schultz v. Village of Lisle* (1972), 53 Ill. 2d 39, 289 N.E.2d 614.) If a court determines that the denial of the special use permit, *including the conditions and restrictions* suggested by the zoning procedures and record as a part of such permit, does not bear a real and substantial relation to the public health, safety, and morals or the general welfare, judicial relief must be granted. (*La Salle National Bank v. County of Lake* (1975), 27 Ill.

App. 3d 10, 325 N.E.2d 105.) In considering the validity of the ordinance and the conditions imposed on the special use permit as applied to plaintiffs' property, the following factors may be considered:

"(1) The existing uses and zoning of nearby property ***, (2) the extent to which property values are diminished by the particular zoning restrictions ***, (3) the extent to which the destruction of property values of plaintiff promotes the health, safety, morals or general welfare of the public ***, (4) the relative gain to the public as compared to the hardship imposed upon the individual property owner *** (5) the suitability of the subject property for the zoned purposes." (*Harris Trust & Savings Bank v. Duggan* (1983), 95 Ill. 2d 516, 532, 449 N.E.2d 69, 76.)

We find that these factors weigh substantially in favor of plaintiffs. As previously noted, there is a Pizza Hut next to plaintiffs' property which serves beer and wine and operates under a special use permit. There is a bar, Wicks, which is also operating under a special use permit. There is also a bowling alley located next to plaintiffs' proposed establishment and a restaurant, the Highway House, both of which serve alcohol and both of which were operating before the 1974 ordinance and thus did not need to apply for a special use permit. There was testimony that surrounding property values would not be diminished by the operation of plaintiff's proposed business. It was found that 60% to 70% of the surrounding area is already commercial. Plaintiff Richard Hahnenkamp himself said that he intended to open an Italian restaurant which is family oriented. Additionally, plaintiff stated, "When you get into an establishment where there's a lot of drinking going on, it would definitely hurt the restaurant business." After considering all the testimony of all the witnesses, we cannot find any evidence to lead us to believe that it is plaintiffs' intention to run anything other than a family-oriented Italian restaurant with incidental sales of alcohol.

Plaintiffs have already taken several steps toward developing their Italian restaurant. Most importantly, they have found a chef to do the cooking and to manage the business. Plaintiffs have also developed plans for the restaurant and have estimated that $40,000 to $50,000 in improvements will be necessary to convert the present building into a restaurant.

Defendants argued that there would be relative gains to the public compared to the hardships imposed upon plaintiffs if the special use permit were denied. Defendants contend that these same gains would be made by imposing the 80% food service restrictions. Defendants

contend the gain to the public would be that the residents of Madison County could be assured that this would not become yet another establishment where drinking was the predominant activity. Again, we find this to be mere speculation and conjecture unsupported by the evidence. However, the hardships imposed on plaintiffs would be real: not only is there the potential for lost profits, but also the added expense to plaintiffs to monitor the 80% levels. Additionally, there is a system already in place which would allow the county to make sure that plaintiffs' proposed establishment does not change its character over the years. Mr. Hawkins, the building, zoning, and environmental official for Madison County, testified that if plaintiffs are granted a special use permit and over the years the character of the establishment changes from a restaurant with sales of alcohol incidental to a bar or tavern where the primary sale is alcohol, the county could revoke plaintiffs' liquor license after a hearing.

As to the suitability of the subject property for the zoned purposes, we can find nothing in the record which would indicate that these restrictions would in any way make the property more suitable for zoned purposes. In the vicinity of plaintiffs' property, there are four other establishments which serve alcohol without such restrictions.

■■ ■ For the above reasons, we cannot find that the restrictions imposed by the trial court bear a real and substantial relation to the public health, safety, morals, or general welfare. However, the nature of a special use permit requires the court to consider added factors in reviewing the reasonableness of the denial of the special use permit or, in this case, the restrictions imposed upon the permit. A court may take into consideration the fact that the proposed special use complies with any and all standards for special uses established by a county since denial of the special use permit for a proposed use which complies with all the established standards is an indication that such denial may be arbitrary and unreasonable. The fact that the proposed special use complies with all standards required does not necessarily mean that the denial, and in this case the imposed restrictions, is arbitrary since zoning is a legislative function and issuance of a special use is not mandatory upon compliance with county standards. (*La Salle National Bank v. City of Evanston* (1974), 57 Ill. 2d 415, 312 N.E.2d 625.) In the instant case, the deciding factor that such restrictions are arbitrary and unreasonable is because, as plaintiffs argued, the restrictions placed on plaintiffs by the trial court are against the manifest weight of the evidence.

The court based its decision to restrict plaintiffs' special use per-

mit on the testimony of plaintiffs' expert witness, Mr. Carl Lossau. In response to the court's question whether there is an accepted ratio of food to liquor sales as a way of defining an ordinance, the following colloquy ensued:

"THE COURT: *** [I]s there a standard ratio of food sales to liquor sales?

A. No; you don't see that necessary in the ordinances.

THE COURT: What would be a range, in your experience?

A. Well, I would say that 90 percent of the sales, anywhere from 80 to 90 percent of the sales would be food.

THE COURT: That, in your professional opinion, would define an establishment as being a restaurant serving liquor by the drink on the premises—

A. Yes.

THE COURT:—as opposed to a tavern or a lounge?

A. Yes, Sir. With a tavern or a lounge, the primary service would be alcohol, alcoholic beverages, and food would be completely incidental. The food might consist of no more than a hamburger that's prepared in the—

THE COURT: As I understand it, the municipalities might enforce such an ordinance by requiring that the owner ring up sales for the bar separate from the sales for the food service.

A. It is done this way.

THE COURT:—and in that manner determine dollar sales of food must be 80 or 90 percent of total revenue in order to maintain the Special Use Permit of a restaurant serving liquor by the drink on the premises, correct?

A. That would be a legitimate—

THE COURT: Very good. Thank you.

Anything further, based strictly on that line of questioning, from the attorneys?

MR. LONG [plaintiffs' attorney]: I guess this opens a new area. We have never discussed about percentages—

A. Yes, we hadn't looked at that.

MR. LONG:—being 80 or 90 percent. And I guess I'm kind of put into a position of asking my own expert where does he come up with the number of 80 or 90 percent.

THE COURT: Sure.

MR. LONG: And I really don't like to be in that position at all. I didn't ask those questions, and I didn't elucidate that."

Plaintiffs' attorney then completed a redirect examination of plaintiffs' expert. The following testimony is pertinent:

"Q. So would you agree with me, Doctor, that that definition shouldn't necessarily be pegged to a gross percentage of revenue being 90 percent, 80 percent of all the revenue is food, when there could be another mix that could be appropriate and still be the primary purpose as being a restaurant, with liquor being incidental?

A. Where the problem comes in here is finding the measure, finding the yard stick. And if a jurisdiction wants to use the dollar sales as the yard stick, you know, that is the elected official's decision on that particular point. And that could be determined at whatever level they felt, based upon whatever study they do is reasonable. But again, the—. I'm sorry.

Q. But in this case they haven't done that?

A. That's right.

Q. And is there anything you can glean from that statutory interpretation of this Madison County Zoning Ordinance which indicates an intent to do that?

A. Nothing."

The expert, Carl Lossau, clearly felt uncomfortable with stating a percentage of food sales to liquor sales in order to define plaintiffs' establishment as somewhere between a pure "restaurant" and a pure "bar." It cannot be discerned from the testimony whether Mr. Lossau's opinion was based on any empirical study which would indicate that 80% would be a fair percentage in which to allow plaintiffs a fair profit margin. Additionally, Mr. Lossau indicated that there would be other ways to distinguish a restaurant from a bar such as a percentage of floor space devoted to each activity.

The trial court's ruling was open to several interpretations. As plaintiffs pointed out in their brief, does the 80% restriction mean 80% of net profit, 80% of gross sales, or 80% of floor space? Is the calculation to be made on each ticket, monthly, quarterly, or annually? Who will monitor the percentages? Does either the county or the court have any enforcement rights, right to inspect, or right to audit? Zoning lies primarily within the province of the county. The trial court went too far in attempting to determine the details of this special use permit.

After analysis of the record and consideration of the specific findings of the trial court, we find that the 80% food service restriction was against the manifest weight of the evidence and bears no real and substantial relation to the public health, safety, morals, or general welfare.

For the foregoing reasons, we find that the judgment of the cir-

cuit court of Madison County that the Madison County zoning ordinance is constitutional is affirmed. We further affirm the judgment of the circuit court as to the issuance of a special use permit to plaintiffs. We reverse as to the restrictions placed on plaintiffs' special use permit.

Affirmed in part, reversed in part.

CHAPMAN and HOWERTON, JJ., concur.